Clarke v. HealthSouth, Mr. Shoemaker. Good morning. May it please the Court, my name is Jamie Shoemaker and I represent Dr. Darius Clarke and Restorative Health and Wellness PLLC in this False Claims Act retaliation action. The most powerful evidence of HealthSouth's corruption, Darius Clarke's opposition to that corruption, and their knowledge of his is their use of a diagnosis, a fraudulent diagnosis that they refer to as disuse myopathy. On May 14, 2009, Dr. Clarke was brand new to HealthSouth Richmond. He was a few years out of medical school, young physiatrist. The National Medical Director for HealthSouth talks to him in Richmond and he had this concern about a PowerPoint he had just received using urging the use of a diagnosis called disuse myopathy. He told Dr. Clohan he had never heard of it. Dr. Clohan, in that verbal conversation, assured him it was legitimate and then she immediately wrote an email to her colleagues within HealthSouth saying, what is this disuse myopathy diagnosis? Clearly, she had never heard of it when you read that email and yet she assured Dr. Clarke it was legitimate. That's just one indicia of the level of corruption of this organization. Dr. Clarke took her at his word. He viewed Dr. Clohan as a mentor and he used the diagnosis until early November of 2009. He had just received another PowerPoint that was urging the use of disuse myopathy and in a level of fraud, an order of magnitude greater, he realized they were using it as a CMS-13 diagnosis. I don't understand how HealthSouth would have been aware that Dr. Clarke was engaged in protected activity. Judge, Dr. Clarke, the district court... He has compliance responsibilities, right? He has compliance responsibilities, Judge, but in addition to the compliance responsibilities, he was a treating physician at the hospital. He told Jeff Ruskin flatly, and the district court found this, that I'm not going to use this disuse myopathy diagnosis. Now, that likely happened in November or December. I don't know how he did anything more, though, than just his normal job duties. That would have put HealthSouth on notice. Sir, that duties defense arose under the old standard where the plaintiff had to show that litigation was in the offing in order to prevail in a retaliation claim under the False Claims Act. It was broadened significantly in 2009 to include other efforts to stop fraud. The Church's case that we cited to the court was an ambulance crew member who refused to sign a single document and the court held that is an effort to stop fraud. That failure to sign, that refusal to sign that one document is an effort to stop fraud and states it is valid, it is actionable under a False Claims Act retaliation measure. This, Judge, this, their existence was at stake with this diagnosis. It was existential. It was not ministerial. The CMS-13 list of diagnoses are vital to them using, to them achieving the elevated payment levels that IRFs could get if 60 percent of their patient base were admitted with a CMS-13 diagnosis. I want to interrupt to make sure I understand your argument precisely. Are you saying that under the amended version of the statute, it doesn't matter whether the protected conduct was entirely subsumed by the person's job or that in this particular instance, some of that conduct went beyond Dr. Clark's job? I am not saying the former. And the Reid case is a good example. If you have someone who is a fraud examiner who works for a company and all they do is say, boss, I found an act of fraud here occurred on September 6th, the employer, I think, in that instance can say, well, that's his job. That's the Reid case. This is the Chorch's case. It's the Chorch's case on steroids. This is a medical director who refused to use a central, seminal diagnosis so that they could achieve their CMS-13 percentage levels. If they didn't do that, then they could not receive CMS-13 funding. So — Is that correct in other cases? Right? Because I think he said that other physicians could possibly — Well, he said it wouldn't be fraud if they believed it to be legitimate. He concluded it was not legitimate. The ICD-10 database has 60,000 diagnoses in it, one for being struck by an orca, one for being bitten by a cow, one for being sucked into a jet engine. It does not have one for disuse myopathy. Out of 68,000 diagnoses, their own expert, Dr. Brattle, wrote a seminal treatise on rehabilitation medicine in the late 90s. He's had six editions since then. The phrase disuse myopathy appears nowhere in any of those treatises. Even Dr. Brattle would not testify that disuse myopathy was a CMS-13 diagnosis. He would only say that it is a medically cognizable diagnosis. That's all he said. There is only one physician on the planet who has said disuse myopathy is a CMS-13 diagnosis, and that's Dr. Dexanne Clohan, their national medical director, and she only did that when backed into a corner in 2020 in a deposition, 10 years after the fact. There is no white paper. There's no research memorandum. There is no internal document in this record evidence that says disuse myopathy is a CMS-13 diagnosis. Not a single thing. And that's part of why HealthSouth ended up paying, what, $40 million? $48 million. And your client actually also recovered as a whistleblower. How much did he get? He received about $3.6 million, and HealthSouth paid him directly, directly about $200,000 for legal fees. So HealthSouth paid his legal fees. So your client did make a claim at some point and recovered. Yes, ma'am. He was a party to the settlement agreement. They make it sound like the U.S. and the States were parties to the settlement agreement and then dismissed Dr. Clark's claims with prejudice. He had to approve it. He was a party to the settlement agreement, and he received substantial funds as a result. He was a brave young physician who took a stand, and they clearly retaliated against him because of his stand, not only in disuse myopathy, but other things. 16% of their IRFs were admitting patients without physician approval. Another 11% were being admitted without any prescreening as required by CMS. How was his salary determined? He had a base stipend of $8,300 approximately a month, and then he made about $540 a patient per month. Now, he basically had a private practice and then a full-time job as the medical director. So I see my time in my initial phase is up. Did he have private practice patients besides these private? No, ma'am. All his patients were at the hospital. Can you address briefly, I think it's constructive discharge as opposed to, he resigned, right? Yes, ma'am, he did because his income was decimated. They admit essentially bypassing him. Jeff Ruskin wrote an email in early January saying, if he denies patients, we're going to have to bypass him. And that's not circumstantial evidence, by the way. That's direct evidence. Why isn't that evidence that he, because at that point in time, he was saying that's not the right way to do it, to admit them without, based on that diagnosis. He says, I'm not going to do it. Right. Okay. And so he said he wouldn't do that. So he didn't get enough patients on his own because he wouldn't admit them on that basis. And so his income went down. No, ma'am, he was not, he was after in December. I just don't understand why there's really enough for constructive discharge here. Well, because in December and January and February, his income, he made a great deal of money. He had an average of 56 patients per month in those months. And did he certify any of those as D, whatever it is, disuse myopathy? Not after November 11, 2009. That is the last patient he admitted on the disuse myopathy diagnosis. Okay. But isn't it part of why his income went down is he no longer refused, he wouldn't admit people on that diagnosis. And they just don't have enough patients coming who qualify. No, ma'am. No, ma'am. He had plenty of patients in December when he wasn't using it, in January when he wasn't using it. They bypassed him in the entire admissions process. And Jeff Ruskin, the executive director of the hospital, made all the decisions about where the patients would go. He admits that. But he's still got his base of 8,300. Yes, ma'am. But he, like all physiatrists, he had overhead. He had to have his own entity. I'm not arguing about that. He's still got his base. They didn't take away the base. Got his base, but he had negative income by August. He was losing $3,000 a month by August, even with the stipend. Any other questions? Okay. You've saved some time for rebuttal. Mr. Lemke. May it please the Court. I'm Matt Lemke, and along with Stanley Blackman, I represent the HealthSouth parties. There are three distinct elements in a retaliation claim, and I want to begin with the third, which is but for causation, and the waiver issue that is critical here, and I think provides a fast track to affirmance. With regard to waiver, the district court found that the assignment protocol that was put forward, about which Dr. Clark complains, that there was a legitimate non-retaliatory reason for it put on HealthSouth, and that Dr. Clark failed to come forward to create a genuine issue of material fact on the question of pretext. And in the blue brief, now the grand total was seven pages of argument in the blue brief. Nowhere in the blue brief does Dr. Clark challenge those findings by the district court, and under settled precedent in this court, if you don't raise it in the blue brief, it's only possible. Forfeit it, but yeah. Yes, sir. The only possible escape route they would have would be constructive discharge on the basis that the conditions were so bad, but there they run into the Perez case, which says if the conduct doesn't change, it's the same before and after the alleged protected conduct, then that can't be but for causation in the retaliation context, and that's what we've got here. He doesn't allege that anything changed other than the assignment process, which is forfeited. So we don't think there's any way that the district court can have anything other than an affirmance of the ruling that the third element was not met. Now let me Have we adopted the McDonnell Douglas test for retaliation claims under the FCA? To my knowledge, not, no, but I don't think it's been suggested by the plaintiff that that was an error for the district court to utilize it here, and I think it's sort of, I'm not aware of any court in the country that hasn't adopted the McDonnell Douglas framework in the retaliation context. And you've Now on the second element, you know, I don't want to belabor it because I think the court fully understands this question of, it was, he acknowledges he was over the entirety of the admissions process, which would include compliance issues, and the primary response from Dr. Clark this morning was the Chorch's case, but what they failed to mention this morning is that in Chorch's, the Second Circuit expressly did not reach the question of notice. They were only addressing the issue of whether it was even protected conduct or not. So I don't think Chorch's gets them there and the issue of the amendment in 2009 doesn't really get them there because the bottom line is, while the 2009 and 10 amendments expanded the scope of protected activity, it didn't in any way anything related to the second element of notice. And then, you know, we think there is a question out there about that the district court did not reach the first element on whether there was protected conduct, but we don't really think that is, that is available to them either. And the district court assumed without deciding that there was protected conduct here, with regard to this disuse myopathy question that they focused on this morning, this court recently in the AceraCare decision said when you have a Medicare benefit, the eligibility for which turns on the exercise of physician judgment, a difference in opinion among physicians cannot give rise to a false claim. In other words, when physicians reach different judgments, that's just reaching different judgments. It's not a lie. It's not false. Okay, let me ask you this. Let's set aside all the forfeiture issues, which of course may not end up being set aside, or if they exist, shouldn't be. But let's assume that none of those issues exist, and that his, and that everything in this case was the same, except that HealthSouth wanted to admit all these people with a struck by an ORCA diagnosis. And Dr. Clark said, nope, I'm not going to do that. These people quite obviously haven't been struck by an ORCA. And everything else happened just the same. Well, I think there'd be a significant difference there, because that would not be an exercise of physician judgment. That would be a factual question of whether they were struck by an ORCA or not. So I don't think you could fairly bring that within the... Isn't it a fact question whether someone has this disuse myopathy condition also? No, I think a question like that is a diagnosis of a medical condition. I think that is, that is more physician judgment than it is, you know, a factual issue. Then make it something else. What if the answer is, we think that all of these people have brain cancer? Wink, wink. Is that different? Well, I think in terms of, you know, when you say wink, wink, I mean, I guess it becomes the context of what did Dr. Clark say? I mean, if he had alerted HealthSouth... except your doctor was saying that it was either. Well, you had in this very case, Dr. Giordano and Dr. Vora, who were exercising their judgment. And what's interesting is, Dr. Clark says, well, when I utilized it, I thought in good faith it was a legitimate diagnosis, so that's not a false claim. He also says he doesn't know whether the others at HealthSouth Richmond who utilized it were, were, you know, acting inappropriately, and yet he wants to suggest that nonetheless their claims are false. So it wasn't false when he did it, because they did it, because he did it in good faith, but when they did it in apparent good faith, he has no reason to doubt it, it was false. I mean, the problem is, and this is why this Court went the way it did in ACERICARE, is when you're dealing with issues of physician judgment, it's very, you can't really say it's false. Then there's an addition. But let's, let's say though that you're not, right? And I understand that this is not, this is not your case, all of the qualifiers, right? But let's say that there was a diagnosis that could not possibly be fairly given to every patient that came in the door. But a company's policy was, in order to get the numbers that we need, you doctors must assign this diagnosis to every single patient that comes in the door. And a doctor said, no, I'm not going to do that. And everything played out as it has. Would that be a problem under the False Claims Act? Well, it would certainly be a problem under the False Claims Act, because it would give rise to a key TAM case that the doctor could bring. Now, and so I think that's an important backdrop here is But would it be a retaliation problem if that doctor got fired for refusing to give that admittedly false diagnosis to every patient that walked in the door? I think you would need to assess what the doctor's particular duties were at the time and exactly how he communicated what it was he was saying. And in light of that, assess whether it put the employer on notice. I don't think... He was engaged in protective activity, right? That's right. That's what all that goes to, right? That's exactly right. Was the employer on notice that the doctor was doing something other than his typical duties that he had in this particular role? And to your... But what if his typical duties involved by their, in that hypothetical, his typical duties would involve doing something to stop false claims? Because his duty, his duties are to diagnose patients. He's being told to give them a false diagnosis, and he's refusing to do so. Well, if his duties include false claims, then I think that likely you could check the notice box. Now, the issue, though, is a mere inclusion of one's duties of regulatory compliance is not necessary. It does not mean the False Claims Act is brought into play because in that last communication that Dr. Clark sent to Mr. Maxheimer, he talked about Medicare audits. Well, Medicare audits is an entirely different statute and doesn't have a CNTER element to it. So, but, you know, to go back to your point, I think, you know, if it were really a totally bogus thing, there would likely be a key TAM case. The question is whether you can fit within the specific settled elements of the additional retaliation case. And in this case, the district court properly found that he didn't get there. And I think if you look... I'm going to ask how much of that depends on debate over whether the diagnosis is appropriate or not. So for purposes of the hypothetical, if there is a conceitedly false diagnosis and a physician whose duty is to make diagnoses refuses to do that, that does, that would result in fewer false claims, even though that particular person is only exercising their professional responsibilities in that context. Right. Well, the Tenth Circuit in Reed said there's still got to be the link to the False Claims Act, the effort to stop a False Claims Act violation. And this court earlier this year in Hickman said that, you know, the False Claims Act requires a false claim. So I think, again, it's going to depend upon the specific evidence of how it was presented and whether the employer knew that it went beyond the doctor's medical director, if that's your hypothetical, his or her particular responsibilities and what the specific facts were to bring it under the ambit of notice of being engaged in protected activity as opposed to just doing their job. What I'm trying to get at is, is it ever possible for someone's job duties, even if it is protected conduct? Let's say if he receives 100 potential admits, none of whom have any diagnosis that will lead to their admission, and he is told to give all 100 of them this false diagnosis, and he refuses to do so. That's 100 less false claims, right? Well, right. But I guess the question is, what are his duties or her duties as medical director? And how does that relate to the communication? What precisely did he or she say back in response to that? Right. He said this diagnosis is false, so I will not give that to these patients. Well, I mean, in the Reed case, you had a compliance person who said it was fraud, and that wasn't enough to put the person on notice that it was invoking the False Claims Act. Remind me what year the Reed case was. The Reed case is 2019, I believe. It's the post-29, 2010 amendment case from the Tenth Circuit. And was that case based on the amended statute or based on the earlier version? Based on the amended statute. Okay. Because I know we have at least one case in this circuit that is post-amendment but deals with the pre-amendment statute. Yes. No, this was a Tenth Circuit case dealing with the new regime. So, I mean, I understand your point. And to some extent, you go back to the late, great Potter Stewart, you know it when you see it. It's very difficult to set bright lines for, you know, when you're dealing with the scope of an employee's duties, you need to know exactly what are the duties and exactly how was it communicated. And then you leave it to the district court to decide, well, is that enough to go to the jury? But I think to, you know, to draw a line, and I think this comes back around to the point I was making earlier is, you know, there are three avenues or three channels under the False Claims Act. You've got claims by the government, you've got whistleblower claims, and then you've got retaliation. And Dr. Clark has seemed to suggest because he had a whistleblower claim that was settled, somehow that automatically leads him to be able to reach the jury on a retaliation claim. But the Ke Tam lawsuit and the whistleblower lawsuit have different elements, and you have to look at the specific elements for each one. And so on your hypothetical you're spinning out, I have no doubt that that doctor would have a very strong Ke Tam lawsuit. But whether he or she also has a retaliation claim depends upon the facts and the precise scope of his or her duty. So if that doctor did exactly what I described in my hypothetical, said I'm not giving these patients the false diagnosis because that would be a violation of the False Claims Act? Well, that's clearly. I mean, if the doctor says I'm not doing it because it would be a violation of the False Claims Act, then clearly the employer is on notice that he's making an effort to stop a False Claims Act violation. I think that distinction would have been obviously just positive before the amendment. But wasn't the amendment designed to get around that sort of requirement? Well, I think the amendment was probably in large measure designed to deal with the fact that there was a circuit split on exactly what was required. Because some circuits said, well, if they're trying to stop it, that was enough under the prior version, and they were back around to, you know, what this court said in Hickman and what the Tenth Circuit said in Reed, you still have to have a link to the False Claims Act. And I think that's why when you look at Reed and you see you had a compliance officer whose job it was to root out fraud, I think the Tenth Circuit put it as telling everyone who would listen that there was fraud. That wasn't enough to let the employer know that this was beyond the compliance person's assigned duties to root out fraud, and the compliance officer was now into the False Claims Act realm. So, again, I think there's got to be the nexus to the False Claims Act, even if you're dealing with the new prong under the amendment. I see my time has expired, and we ask that the district court be affirmed. Thank you. Thank you, Mr. Lemke. Mr. Shoemaker. HealthSouth began their argument before you just saying that we did not do anything to rebut a legitimate business reason for decimating— Your blue brief says not a word about pretext. Neither did HealthSouth in front of the district court. In front of the district court, HealthSouth did not raise— The district court, though, raised— The district court did raise it, but it doesn't apply, Judge. It doesn't— If the district court relied upon it, you're attacking the judgment of the district court when you file a Notice of Appeal, and you're obliged to make every argument necessary to knock down the reasoning of the district court's opinion, and you didn't say a word in your blue brief about this. Judge, my brief has a survey in it where 16 percent of patients are admitted to their hospitals without physician approval. But, Judge, let me go to a legal matter on this. McDonnell-Douglas does not apply. It doesn't apply— You've never argued that. Judge, this is a direct evidence case. It's a direct evidence case. They did not— Their asserted—It's got to be a legitimate business reason. Judge, their reason has to be legitimate. It wasn't legitimate— Did the district court apply the McDonnell-Douglas framework? The district court did apply the McDonnell-Douglas framework. And did you, in your blue brief, say that that was there? I did not. I did not. Okay. That's what I thought. Judge— You know, I just not—this sounds like a totally new conception of the case to me. Judge, that is because the evidence in this case is shot through with corruption. The corruption plainly rebuts the idea that they have a legitimate business reason to decimate his patient load. If they were an honest organization, what they would have done is they mandated medical director who runs our rehab program that we told you run our rehab program, we're removing him because we have this legitimate business reason he is denying too many patients who are otherwise qualified for admission. They didn't do that. They continued to lie to the government and tell the government, Dr. Clark is our rehab director when they are, in fact, bypassing him. That—they cannot argue that that is a legitimate reason. That evidence has been in this case since day one. They cannot argue that that is legitimate to say—to lie to the government about who their medical director is. You can't argue that their legitimate non-discriminatory reason was pretextual when you didn't make that argument in a blue brief. It is subsumed. It is subsumed with all of my arguments. I'm accusing them of corruption, Judge. This wasn't a close call. This was corruption. And they were admitting almost over one in five patients without any review. That is implicit in every argument I've made. And it's really driven home by 42 CFR 41229G that says they have to have a rehabilitation director, and they lied to the government from about March on saying, Dr. Clark is our rehabilitation director, knowing that they were bypassing him. Counsel—and another fact that's kind of gotten conflated that the district court clearly didn't—wasn't cognizant of, Dr. Vora did not get there until April of 2010. And that's when the decimation really accelerated, though it began in February. Counsel raised the Acericare case and that—for the proposition that when you have two sides to an argument, it can't be actionable and it can't constitute for the basis of a claim like this. In Acericare, there are legions of physicians and mounds of literature on both sides of the issue in Acericare. That is not the case here. In this case, there's only one person on the diagnosis. Both of Darius Clark's written communications complaining of their fraudulent practices refer to our many conversations, both of them. The first one was written on October 29, 2009. The second one was written on June 4, 2020. These facts have to be viewed in a light most favorable to Dr. Clark. And when you look at all the evidence, and one key piece of evidence that I did not hit in the brief very well, but it's in the materials, it's in the record, is the discharges. This Jeff Ruskin, who is a non-clinician, he's the man who came up with the ostensibly legitimate business reason to bypass Dr. Clark. He is a non-clinician. He is an administrator. He's not qualified to make a determination about whether Dr. Clark is comfortable admitting certain patients or not. He would hold patients in the hospital, and this is summarized in Dr. Groh's report very succinctly and very well, numerous emails, no more discharges, no more discharges. We've got to keep our census up. We've got to keep our CMS-13 compliance up. Don't discharge them. This man that offered this allegedly legitimate reason was willing to falsely imprison patients, keep them there when they shouldn't be there, so he could have his census stay high. Their proffered reason is illegitimate. It is not legitimate. An argument made for the first time at oral arguments. Judge, if it's clear from the record. Yeah, that's not, show me the case law to support that. If you didn't raise it in the blue brief, it is forfeited. And the district court pointed out that you had no evidence in support of this. You didn't complain about the use of the McDonnell-Douglas framework in your appeal. And then when you filed, you know, your brief, you didn't make any argument to knock down this finding by the district court. I, you know, I don't know what I'm missing. Judge, we assert that the proffered alleged legitimate reason is patently illegitimate for the reasons I just cited. And that's, those facts have been in the record since day one. I see my time's expired. Thank you. Thank you.